**Ronald W. HELMS, individually and on behalf of all persons similarly situated, Plaintiff,**

v.

**CONSUMERINFO.COM, INC., a corporation, Defendant.**

**No. CV 03 HS 1439 M.**

United States District Court, N.D. Alabama, Middle Division.

Feb. 14, 2005.

John G. Dana, Lowe Grammas Hitson & Dana LLP, Birmingham, AL, Peter A. Grammas, E. Clayton Lowe, Jr., William J. Trussell, Trussell & Funderburg, Pell City, AL, for Plaintiff.

Amy Payne, Jones Day, Dallas, TX, Jerome R. Doak, S. Andrew Kelly, Samuel H. Franklin, Lightfoot Franklin & White LLC, Birmingham, AL, for Defendant.

### *MEMORANDUM OF DECISION AND ORDER*

HOPKINS, District Judge.

#### *Introduction*

The instant case calls upon the court to interpret and apply provisions of the Credit Repair Organization Act (hereafter

"CROA"). The cornerstone of the parties' dispute is whether ConsumerInfo.com, Inc., (hereafter "Defendant") qualifies as a "credit repair organization" as defined in the CROA. Within the Eleventh Circuit there is no published case law addressing application of the CROA, much less this specific issue. Although other federal courts have entertained suits based on the CROA, a large body of case law does not exist. Eugene J. Kelley, Jr., John L. Ropiquet & Andrea J. Durkin, *The Credit Repair Organization Act: "The Next Big Thing?,"* 57 CONSUMER FIN. L.Q. REP. 49, 50 (2003). Accordingly, whether Defendant qualifies as a credit repair organization is an issue of first impression for this court.

### Procedural Background

On June 17, 2003, pursuant to 15 U.S.C. § 1679g which allows for private causes of action, Ronald W. Helms (hereafter "Plaintiff") filed a putative class action for damages alleging Defendant violated § 1679b(b) of the CROA (Count One). Plaintiff also brought claims for unjust enrichment (Count Two), constructive trust (Count Three), and conspiracy (Count Four). Defendant answered on July 31, 2003, denying liability and asserting affirmative defenses. Nearly a year after the original complaint was filed, Plaintiff filed his first amended complaint. Plaintiff's amended complaint added to Count One violations of § 1679b(a)(3), § 1679b(a)(4), § 1679c, § 1679d, and § 1679e(b) and (c). Counts Two, Three, and Four were realleged and unamended.[1] Defendant answered, denied liability, asserted affirmative defenses, and contended that the CROA does not apply to it.

Defendant then moved to sequence the proceedings and requested that the court delay the previously scheduled hearing on class certification until it had ruled on both parties' summary judgment motions. By its November 22, 2004, order the court granted Defendant's motion and scheduled oral argument on summary judgment for February 7, 2005.[2] Now remaining before the court are Plaintiff's Count One for violations of the CROA and Count Two for unjust enrichment.[3] The court has before it both parties' motions for summary judgment and accompanying evidentiary submissions therewith. In addition, the Court has received and reviewed the Plaintiff's opposition to Defendant's cross-motion for summary judgment and Defendant's reply thereto. Both motions are under submission.

### Undisputed Factual Background [4]

In 1995, Edward Ojdana founded ConsumerInfo.com, Inc., the Defendant in this case. (Pl.Ex. B at 19). Defendant is a corporation which provides consumers with information allowing them to read, understand, and monitor their credit history. (Pl.Ex. C at 97; Def.App. I, Tab 1, ¶ 2). Mr. Odjana is the president of Defendant and oversees all the general operations of the corporation. (Def.App. 1, Tab 1, ¶ 1). Through websites, television, and radio, Defendant markets its products, which include: 1) credit reports, 2) credit scores, and 3) the "CreditCheck" credit

---

1. This case was originally assigned to Magistrate Judge Robert Armstrong. On June 23, 2004, it was reassigned to the undersigned.

2. Pursuant to the Court's January 11, 2005, order, the hearing date was changed to February 28, 2005.

3. On November 22, 2004, the court dismissed Plaintiff's Count Four for conspiracy pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court also noted that Plaintiff's Count Three for constructive trust is an equitable remedy and was not properly pleaded as a cause of action.

4. Where there is a factual dispute, unless otherwise noted, the facts are stated in the light most favorable to the non-movant.

monitoring service. (Pl.Ex. C at 28; Def. App. I, Tab 1, ¶ 8). More than three million consumers have purchased Defendant's services and products. (Pl.Ex. C at 280). These sales have generated approximately three hundred million dollars in revenue for Defendant. (Pl.Ex. B at 218).

Defendant offers its customers two varieties of credit reports: a single bureau report and a three bureau report. (Def.App. I, Tab 1, ¶ 10). A visitor to one of the Defendant's websites can purchase a single bureau report for $9.95. The report can be delivered by mail or viewed on line and is typically available the instant the customer enters his credit card information. (Def.App. I, Tab 1, ¶ 10). A three bureau report contains information from each of the three principle credit bureaus. The three bureau report costs customers $34.95 and is also viewable online or can be delivered by mail. (Def.App. 1, Tab I, ¶ 10, 11).

Defendant also provides its customers with credit scores. Credit scores are calculated using different formulas, depending on which credit bureau does the scoring. Credit scores are one factor that credit grantors use in determining a consumer's credit worthiness. Because the information on an individual's credit report may vary between the three principle bureaus, a customer may purchase a score from each bureau to compare his ratings.

Defendant calculates a customer's score using computer software licensed from its parent company, Experian, and a "Credit-Check" member may purchase multiple scores for five dollars each. (Def.App. I, Tab 1, ¶ 12–13).

Finally, Defendant offers its customers the "CreditCheck" service, which allows a computer to monitor a customer's credit reports daily and to alert the customer to any irregularities or problems. (Def.App. I, Tab 1, ¶ 15). In order to check his report as it is monitored, a customer must use his password and access a secure portion of Defendant's website, wherein he can check for any alerts. When Plaintiff purchased "CreditCheck" the alerts were provided monthly. (Def.App. I, Tab 1, ¶ 15). With the purchase of "Credit-Check," each customer is entitled to unlimited credit reports from Experian, one of the major credit bureaus. (Def.App. I, Tab 1, ¶ 16).

Defendant owns multiple websites,[5] all of which pertain to credit matters and allow site visitors to obtain information on their own credit or purchase one of Defendant's products. (Def.App. I, Tab 1, ¶ 7). When a customer visits one of Defendant's websites, all of the information on the initial "level" is free. (Def.App.I, Tab1, ¶ 28–33). The second "level" is for members only and can be accessed by any customer

---

5. The Defendant owns the following websites, ConsumerInfo.com; CreditMatters.com; FreeCreditReport.com; Qspace.com; Nationalscore.com; GetMyReport.com; and HomeRadar.com. Defendant argues that Plaintiff misstates the record by alleging that ConsumerInfo.com makes certain representations that are not on *www.consumerinfo.com,* but rather appear on one of its other free websites, such as *www.creditmatters.com. See e.g.,* (Def.App. VII at ¶ 23 & ¶ 24). While Defendant is correct, its assertions are of no consequence because it owns all of the websites, and all of the websites are part of Defendant's business network. In fact, at the top of *www.credit-* *matters.com,* Defendant's name "ConsumerInfo.com" is boldly displayed. Furthermore, even though *www.creditmatters.com* has a separate web address, you can reach that website and all of Defendant's other websites via links on the main webpage. All of Defendant's websites combined, regardless of their technical juxtaposition, are most properly described as different facets of Defendant's namesake website. The Court acknowledge, that if each of Defendant's websites were owned by a separate subsidiary, then what one website advertises might not be properly attributable to Defendant. However, that is not the case here.

who purchases the "CreditCheck" service. (Def.App.I, Tab1, ¶ 37). When a customer chooses to enroll in the "CreditCheck" program he is subject to a free trial, during which he has access to all the materials on the website free of charge, and may cancel at no cost during the first thirty days. (Def.App. I, Tab 1, ¶ 18).

In order to market its products better, Defendant enters agreements with "partners," such as Yahoo! and Google. (Pl.Ex. C at 32). Defendant pays fees to its partners for certain key words. Whenever a site visitor runs a search containing those key words, Defendant's partner's website will list Defendant's website as a "sponsored result." (Pl.Ex. D at 33).

Defendant's website, among other things, provides visitors with advice on how to manage their credit. Specifically, Defendant's website advises consumers that they can "[a]ctively Monitor and Manage" their credit by paying bills on time and by keeping a close watch for inaccuracies in their credit history. (Pl.Ex. H at 1). Defendant's website promotes its product "CreditCheck" as a good way to keep track of one's credit history. (Pl.Ex. H at 1). For those customers who choose to purchase a membership, which includes the "CreditCheck" service, Defendant's website offers "expert" advice on how to dispute inaccuracies on a credit report. (Pl.Ex. N at 1). These customer service "experts" are not necessarily trained to know what kind of information creates a negative credit rating. In general, the "experts" are trained to know what a credit file is and who keeps track of the reports. They are also informed that customer information is very private and should be kept secure at all times. (Pl.Ex. C at 208). Because the majority of the customer interaction is automated, in most instances Defendant's representatives do not actually see any of the customer's

credit information. (Def.App. I, Tab 1, ¶ 24). Defendant's website also advises against using so-called "credit repair" clinics and tells customers that an individual can accomplish anything a credit repair clinic can for free. (Pl.Ex. H at 1). In addition the website also warns that many "credit repair" clinics are frauds and are under investigation by the FTC. (Pl.Ex. H at 1).

Ronald Helms, the Plaintiff in this case, has a history degree from Livingston University.[6] (Def.App. III, Tab 27 at 12). Plaintiff owned his own insurance business from 1979 until 1998, when his company was purchased by Union State Bank. (Def.App. III, Tab 27 at 22, 24). Even after Union State Bank purchased his insurance company, Plaintiff retained his position as president, which he currently still occupies. (Def.App. III, Tab 27 at 25). Plaintiff pays his credit card bills on time each month and does not carry a balance on any of his credit cards. (Def.App. III, Tab 27 at 36–37).

In 2002, Plaintiff became aware that there was a problem with his credit report involving an account with Cingular Wireless. (Def.App. III, Tab 27 at 37–40). In an attempt to remove the erroneous Cingular charge from his credit report, on February 28, 2003, Plaintiff visited Defendant's website ConsumerInfo.com and purchased the "CreditCheck" computer monitoring service. (Def.App. III, Tab 27 at 134; Tab 26, ¶ 3). In connection with his purchase, Plaintiff received a credit report and viewed it on Defendant's website. (Def.App. III, Tab 27 at 98, 115). Plaintiff also received an email confirming his purchase of "CreditCheck," and outlining the other benefits included with his purchase of a membership in Defendant's program. (Def.App. III, Tab 27 at 98–99). After his initial visit to Defendant's website, Plaintiff never returned to the website. (Def.App.

---

**6.** Livingston University is now the University of West Alabama.

III, Tab 27 at 126). A month after Plaintiff purchased a membership from Defendant's website, on March 27, 2003, his credit card was billed for $79.95, the fee for "CreditCheck." (Def.App. III, Tab 26, ¶ 5). A few months later Plaintiff filed the instant action.

### Summary Judgment Standard [7]

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir.2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

---

7. Because this court has yet to rule on class certification in this case, a summary judgment ruling against Plaintiff will not bind the as yet unnamed class members. David F. Herr, Manual for Complex Litigation § 21.11 (4th ed.2004); *see also Smith v. Network Solutions Inc.*, 135 F.Supp.2d 1159, 1165–1166 (N.D.Ala.2001), *aff'd*, 29 Fed.Appx. 575 (11th Cir. Nov.21, 2001) (finding it proper to rule on summary judgment prior to class certification and recognizing that unnamed class members would not be bound by the court's decision); *Thornton v. Mercantile Stores Co., Inc.*, 13 F.Supp.2d 1282, 1289–1290 (M.D.Ala.1998) (noting that "in moving for summary judgment prior to class certification, the defendant is assuming the risk of stare decisis protection rather than the protection of res judicata").

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

## I. Background and Statutory Scheme of the CROA

■ In 1993, testimony before the Senate confirmed that:

[f]raudulent companies that lead consumers to believe that the companies can "repair" bad credit histories have bilked consumers of millions of dollars in the past several years, have caused consumer reporting agencies to waste time and money reinvestigating spurious disputes, and have been the focus of numerous enforcement actions by the FTC.

S.Rep. No. 103–209, at 7–8 (1993). Based upon these and other findings, in 1996 Congress enacted the Credit Repair Organization Act (hereafter "CROA"). Kelley, 57 Consumer Fin. L.Q. Rep. at 50. The goal of the CROA is to prevent "credit repair organizations" from misleading consumers as to their rights and liabilities connected with their credit history. *See generally id.* The CROA's requirements allow consumers unfettered access to their own credit records and educational materials, while at the same time protecting them from "unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C.A. § 1679(b)(1)-(2).

To accomplish its goal and ensure that credit repairs organizations do not mislead unsophisticated consumers, the CROA mandates specific procedures that credit repair organizations must follow and prohibits them from engaging in deceptive practices. *See generally* §§ 1679a— 1679e.[8] For example, a credit repair organization may not accept payment from any consumer before the promised service is completed. § 1679b(b). In addition, be-

---

**8.** Section 1679a(3)(B) provides that several types of businesses, such as banks, are excluded from the definition of credit repair organi-

zation. None of those exceptions are applicable to the instant case.

fore entering a contract with a consumer, a credit repair organization must provide the consumer with a written statement outlining the consumer's rights. § 1679c(a). The CROA also requires that certain information be contained in any credit repair contract and provides the minimum time within which the customer may cancel his or her contract. §§ 1679d–1679e. While nearly all of the CROA's provisions apply only to credit repair organizations, § 1679b(a) applies to any "person," and prohibits the making of fraudulent or deceptive statements regarding the services of a credit repair organization. *See e.g., Bigalke v. Creditrust Corp.*, 162 F.Supp.2d 996, 999 (N.D.Ill.2001) (finding that even if defendant was not a credit repair organization, it was still subject to prosecution under § 1679b(a)(3) and (4)). The CROA also provides for specific damage limitations, allows awards for attorneys' fees, allows for punitive damages, and contemplates the use of class actions as a suitable vehicle for enforcement of the statute. § 1679g.

█ At the outset, the court notes that when interpreting a statute the initial inquiry is whether the meaning of the statute's language is "plain and unambiguous." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). If it is, the court's inquiry should go no further. *Id.; see also BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 124 S.Ct. 1587, 1595 n. 8, 158 L.Ed.2d 338 (2004) (noting that looking to legislative history absent "ambiguous statutory text," constitutes a "radical abandonment of . . . longstanding [Supreme Court] prece-

dents."); *CBS, Inc. v. EchoStar Communications*, 265 F.3d 1193, 1212 (11th Cir. 2001) (when interpreting a statute "ambiguity in statutory language must be shown before a court delves into legislative history.").[9] Moreover, "statutory language cannot be construed in a vacuum," and "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (quoting *U.S. v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984)). Plaintiff correctly points out that because the CROA is a consumer protection statute, with a remedial purpose, it should be given a liberal or broad interpretation. *See e.g., Parker v. 1–800 Bar None, A Financial Corp., Inc.*, No. 01 C 4488, 2002 WL 215530 at *2 (N.D.Ill. Feb.12, 2002); *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir.1998). However, even allowing for a "liberal" interpretation, absent ambiguity, this court may only give the CROA the meaning mandated by its plain language. In other words, the Court will not expand or constrict the statutory definition of credit repair organization where Congress has made its meaning clear.

## II. Defining Credit Repair Organization under the CROA

█ The plain language of the CROA defines credit repair organization as any organization that *performs* or *represents* that they will perform,

 any *service* in return for the *payment of money* . . . for the *express or implied*

---

9. Stated another way, "The cardinal rule of statutory construction is to ascertain the legislative intent and purpose in enacting the law and to construe the statute to effectuate that intent, but when statutory language is plain and unequivocal, judicial construction is not only unnecessary but is forbidden." *Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1088 (11th Cir.2004) (internal quotations omitted).

*purpose* of—(i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . .

§ 1679a(3)(A) (emphasis added). It is clear that Defendant provides as least some form of service for money as contemplated by the CROA.[10] Thus, Plaintiff must show that Defendant either actually performs credit "repair" services or that it represents that it will do so.

■■ Plaintiff contends that Defendant markets its services to those interested in "improving their credit."[11] Specifically, Plaintiff points to an advertisement for Defendant on the website of one of Defendant's partners, which invites customers to "[m]aximize [their] credit rating." (Pl.Ex. D at 1). Plaintiff also points to pages on Defendant's website offering that customers can learn how to "establish" or "rebuild" "good credit." Defendant's online form for ordering a free credit report asserts that customers who choose to purchase an additional credit score for $5.00 will receive "personalized tips that can help you raise your credit score." (Pl.Ex. K at 1). One document produced by Defendant shows a page on its website which advises customers that Defendant's "personalized analysis with tips . . . can help you improve your credit rating." (Pl.Ex. P at 1).[12] Defendant's customers routinely contact Defendant through email and ask for advice on how to improve their credit. (Pl.App. Ex. 4 at 101–102).[13] Moreover,

---

10. Defendant concedes that it charges money for three products, "(1) credit reports; (2) credit scores; and (3) CreditCheck." (Def. Mem. in Support of Sum. Jud. at 50). The court accepts that credit reports are not a "service." While Defendant argues that *"CreditCheck" monitoring service* is not in fact a service, the court is unpersuaded. The fact that "CreditCheck" is a completely automated process is not decisive. Defendant's customers do not purchase the "CreditCheck" software, but rather they pay a yearly membership so that Defendant will use "Credit-Check" software to monitor their credit history. As a part of CreditCheck, Defendant also provides customers with pre-written dispute letters from its website. Defendant's Credit-Check program is more honestly characterized as a service than as a product. As regards credit scores, it is less than clear which category this falls into. However, for present purposes the court is willing to assume that the assembly and calculation of credit scores and analysis also constitutes a service within the plain meaning of the statute. *See* (Def.App. I, Tab 1, ¶ 13–14). The above interpretation is consistent with the Eleventh Circuit's recognition that "[c]ommon sense is the most fundamental guide to statutory construction." *Wilderness Watch and Public Employees for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1093 n. 9 (11th Cir.2004).

11. Plaintiff offers a virtually inexhaustible list of quotes from Defendant's website, materials, mailings, etc. Some not mentioned in the text include the following: "CreditCheck Monitoring Service keeps you on top of information that may affect your credit;" "credit check alerts allow you to take an active role in your credit and may help you find and dispute inaccuracies;" Credit Check will help you "take control of your credit."

12. The page on which this appears is a free page, which offers a free credit score accompanied by the aforementioned "tips" with the purchase of a three bureau credit report from Defendant.

13. Defendant argues that much of the evidence concerning its websites and its customer service email should not be considered because a) its webpages have not been authenticated and b) because Plaintiff himself did not contact customer service and did not read many of the webpages presented as evidence. *See e.g.*, (Def.App. VII at ¶ 27 & ¶ 39). Defendant contends that unauthenticated documents cannot be viewed on summary judgment because they would not be admissible at trial. There is no evidence that any of Plaintiff's webpages are not authentic, and were this case to go to trial, undoubtedly, Plaintiff would be able to authenticate the webpages.

Defendant also purchased multiple phrases containing the word "improve" from Google.com, such as "improve your credit rating" and "how to improve your credit score." (Pl.App. Ex. 1A to Ex. 14 at 1A–14). As explained earlier whenever an individual enters these search terms on Google.com, Defendant's name will appear under the sponsored results.

When addressing language similar to that used by the Defendant, other courts applying the CROA have concluded that such language brings an actor within the definition of credit repair organization. For example, in *In re National Credit Management Group, LLC* (NCMG), the state of New Jersey and the Federal Trade Commission brought an enforcement action against the defendant for violations of various consumer credit statutes and FTC regulations. 21 F.Supp.2d 424, 431 (D.N.J.1998).[14] The defendant, National Credit Management Group (NCMG), offered customers credit monitoring, and a "confidential analysis" of their credit history, aimed at helping them to re-establish their credit. *Id.* In addition, NCMG's advertisements offered customers a pre-approved credit card application. *Id.* NCMG marketed its products through a 1–800 number and radio and t.v. ads. *Id.* Like Defendant in the instant case, NCMG also promised its customers attention from a "trained credit analyst." *Id.* at 434. In-

vestigation of NCMG revealed that it did not obtain any of the information it promised its customers, and its "trained analysts" did not have any special training in the credit industry. *Id.* at 433.

The New Jersey Court acknowledged that NCMG did not actually provide credit repair services as contemplated by the CROA. *Id.* at 457. However, the Court found that NCMG did "**represent** that they [would] perform services, monitor, and provide advice to assist customers improve their credit ratings." *Id.* (emphasis added). Accordingly, the Court concluded that NCMG fell squarely within the definition of credit repair organization as contemplated by the CROA. *Id.* at 458.

Likewise, in *Sannes v. Jeff Wyler Chevrolet, Inc.*, the plaintiff brought claims against the defendant, a car dealership, claiming violations of the CROA. No. C–1–97–930, 1999 WL 33313134, at *1 (S.D.Ohio Mar.31, 1999). On summary judgment, the defendant argued that it did not fall within the definition of credit repair organization. *Id.* The *Sannes* Court noted that defendant placed its advertisements in a newspaper in interstate commerce, and that the advertisements promised to help customers "[r]e-establish" their credit. *Id.* at *2. The Court reasoned that such language "implies" that it "will help consumers improve their credit rating." *Id.*

Therefore, the Court may consider this evidence on summary judgment despite the fact that it has not been formally authenticated at this stage of the case. *See McMillian v. Johnson*, 88 F.3d 1573, 1584–1585 (11th Cir. 1996). As to Defendant's other argument, the CROA does not have any requirement of reliance. According to the statute's plain language, it is enough that Plaintiff purchased Defendant's online service. In determining whether Defendant is a credit repair organization, the Court need not limit itself to only those webpages or statements which Plaintiff specifically recalls seeing. Rather, the Court may look to the entire nature of Defendant's

business and the representations that it makes in order to arrive at a conclusion. *See generally* §§ 1679a—1679g.

**14.** In an attempt to distinguish the *NCMG* case, the Defendant points out that NCMG was running a "scam," and didn't provide its customers with the promised result. In contrast, Defendant contends it actually delivers "everything that it promises." While the court acknowledges that the facts of the *NCMG* case and the instant case are not identical, both NCMG and Defendant engaged in very similar advertising and made analogous representations to consumers.

While these cases are not binding upon this court, their reasoning is persuasive. The Defendant here uses words like "establish," "rebuild," "raise," and even "improve," to describe the effect its products and services will have on a consumer's credit rating. Although the language does not always directly promise to improve a credit rating, and some of the language concerning "improvement" relates to free products or services, the net message is clear. Moreover, Defendant's purchase of search terms containing the word "improve" in conjunction with the term "credit rating," indicates that Defendant intends to market its products to those looking to improve their credit rating. At the very least, the representations of Defendant imply that its services will help customers improve their credit ratings.[15]

Under the CROA, a business is a credit organization even if its representations only have the "implied purpose of" improving a credit rating. § 1679a(3)(A). Furthermore, Defendant's representation that it will provide "tips" to help customers improve their credit ratings also falls squarely within the language of the CROA, which provides that those who "provide advice or assistance ..." concerning credit history improvement are credit repair organizations. § 1679a(3)(A)(ii). In short, Defendant provides a service for money and represents that its services will im-prove a customer's credit rating. The plain language of the statute warrants only one conclusion: Defendant is a credit repair organization subject to the strictures of the CROA.

Defendant argues that, when taken in context, it is clear that organizations like itself, which only "monitor" credit, were not intended to be covered by the CROA.[16] The court rejects this contention. Defendant points to commentary by the FTC contained in the Code of Federal Regulations, which suggests that "credit monitoring" programs were not meant to be regulated. 16 CFR § 310.04 at 30416. Defendant acknowledges that this commentary is not aimed at the CROA, but rather the Telemarketing Sales Rule. Nevertheless, Defendant argues that the CROA is part of an entire scheme of consumer protection statutes (of which the Telemarketing Sales Rule is a part) which provide the proper context in which to view the CROA itself. According to Defendant, these consumer protection statutes were not meant to stifle, but to encourage, the free flow of educational materials such as the ones it provides. The referenced FTC commentary in its entirety says "services, such as monitoring or counseling, that *are **not represented to improve a person's credit history**,*" were not meant to be covered. 16 CFR § 310.04 at 30416 (emphasis added).

---

15. The court does not necessarily believe the Defendant's statements to be untrue. Indeed, if a customer follows the advice offered on Defendant's website, in certain instances and over a long period of time, the customer's credit rating might improve. Regardless, the CROA's plain language does not distinguish between organizations that purport to help improve consumer credit legally and those that purport to do so illegally. All that is required is that the business imply its services will improve a consumer's credit history.

16. The difficulty with this case lies in the conflict between the desire not to chill the dissemination of purely educational materials or prohibit counseling and monitoring, while at the same time preventing businesses from using advertising to take advantage of uninformed consumers. As the district court for the Eastern District of New York recognized, "there is a fine line, in advertising and soliciting for credit counseling services to an unsophisticated audience of lower-income debtors, between promising future rewards for creditworthiness, and implying that existing bad credit records may be prematurely expunged." *Limpert v. Cambridge Credit Counseling Corp.,* 328 F.Supp.2d 360, 364 (E.D.N.Y.2004).

Thus, a complete reading shows that even if an organization only "monitors" credit, yet represents it will improve credit, then it was meant to be covered.

■ Defendant makes many more arguments based upon commentary.[17] Even if the court agreed that this commentary establishes that Defendant should be exempt from the CROA, which it does not, these arguments are not dispositive because as the *NCMG* Court recognized, FTC commentary is not binding. *See Heintz v. Jenkins*, 514 U.S. 291, 298, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995); *see also Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1372 n. 2 (11th Cir.1998) ("FTC's construction of the FDCPA [Fair Debt Collection Practices Act] is not binding on the courts."). Defendant also points out that much of the information on its website is contained on other websites, such as the FTC's website or the Alabama Attorney General's website. Such educational material is clearly encouraged by the CROA and not meant to be prohibited, but Defendant overlooks the major difference in these public websites and its own. These public websites only disseminate information that is free. Defendant offers a service and charges money for it. This is the very type of activity the plain language of the CROA extends to cover.

Finally, this court is under no obligation to address the intent of Congress because the language of the CROA is clear. *See CBS, Inc.*, 265 F.3d at 1212. Even if the language of the statute is later deemed to be ambiguous, thus necessitating an examination of the statutory history, the court finds that organizations like Defendant were intended to fall within the umbrella of the CROA.[18] The court finds it doubtful that Congress intended the definition of credit repair organization to be construed so narrowly so as to cover only fraudulent companies. This is supported by the fact that Congress actually recognized that some credit repair organizations are legitimate and helpful. S.Rep. No. 103–209, at 7 (1993) ("While some of these [credit repair] organizations may benefit consumers, ... a number of fraudulent credit repair organizations have inappropriately led consumers to believe that adverse information in consumer reports can be deleted or modified regardless of the accuracy of the information").

The general scheme of the CROA also supports the notion that non-fraudulent organizations fall within the definition of

17. Defendant also contends that if it is subject to the CROA, the statute's reach would expand to cover entities never contemplated by the Congress. Thus, the "Dear Abby" advice column and books by Suze Orman (an author who focuses on financial advice) would fall under the CROA. The court is unpersuaded by this argument. An examination of the excerpts offered by Defendant show that Suze Orman's book is merely informative and does not represent or even imply that it will "improve" a person's credit rating. (App. III, Tab 22). Likewise, the Dear Abby column referenced by Defendant merely offers advice about how to avoid identity theft. While Defendant may provide similar advice for free, its other products are not free, and its advertisements send the distinct message that its services will improve a person's credit rating.

Thus, the comparisons Defendant makes are simply inapposite. Even if the court's interpretation of the CROA would extend regulation to others such as author Suze Orman, an extension the court views as improbable, that is not the question before the court.

18. For example, in *Sannes*, the Court concluded that the CROA was aimed at "bogus credit repair organizations" and "credit repair cons," not car dealerships. 1999 WL 33313134, at *3. The *Sannes* Court noted that the defendant's promise to repair credit was not being charged for and it was "ancillary" to its main business of selling cars. *Id.* at *4. In contrast here, Defendant's entire business and sole way of making profit revolves around the credit industry.

credit repair organization. The CROA is not a blanket prohibition on the operation of credit repair businesses. Rather, the CROA only regulates such businesses to ensure that consumers are not duped and that they receive full disclosure concerning the purchases they make. Were the statute meant only to cover fraudulent organizations, Congress would have simply made it illegal to operate these businesses at all. Furthermore, other portions of the CROA address fraud and misrepresentation directly, yet the definition of credit repair organization makes no mention of it at all. *See* § 1679b(1)—(4). Had Congress meant for only "scams" or "frauds" to be part of the term credit repair organization, it could have said so. *See Brown v. Gardner*, 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ("[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). In sum, a comprehensive reading of the statute and its history support the proposition that Defendant does indeed fall within the definition of credit repair organization in the CROA and is subject to its strictures.

■ Because the CROA does apply to Defendant, Defendant must comply with the statute's provisions. Defendant's sale of CreditCheck violates § 1679b(b) because, until 2004, Defendant's customers were charged for a year of credit monitoring prior to actually receiving the complete service. Defendant admits as well that it does not comply with § 1679c because it does not provide the required disclosure to its customers prior to entering into a contract. (Pl.Ex. C at 276). Likewise, Defendant does not provide its customers with a written contract as required by § 1679d and § 1679e(c). (Pl.Ex. A at 2). Neither does Defendant provide the required cancellation form provided for in § 1679e(b).

(Pl.Ex. C at 278). Defendant makes no argument contradicting that it does meet the above-listed requirements. Accordingly, because there is no genuine issue of material fact that Defendant is subject to and violated these specific sections of the CROA, Plaintiff is entitled to a judgment as a matter of law on these issues, and summary judgment is due to be granted.

### III. § 1679b(a)(3) and (4) fraud under the CROA

In addition to his claims that Defendant failed to comply with sections of the CROA applying only to credit repair organizations, Plaintiff also moves for summary judgment on his claims that Defendant made "untrue or misleading" representations and committed fraud as defined in § 1679b(a)(3) and (4). As Plaintiff points out, several courts addressing these sections of the CROA have found that they are more permissive and apply to "any person" and not just credit repair organizations. *See e.g., Parker v. 1–800 Bar None*, No. 01 C 4488, 2002 WL 215530, at *5 (N.D.Ill. Feb.12, 2002); *FTC v. Gill*, 265 F.3d 944, 955 (9th Cir.2001); *Bigalke v. Creditrust Corporation*, 162 F.Supp.2d 996, 999 (N.D.Ill.2001). While it is true that § 1679b(a)(3) and (4) do apply to those who are not credit repair organizations, the Defendant correctly argues that the misrepresentations addressed in these sections must be made about "the services of a credit repair organization." Regardless, in the instant case further discussion is unnecessary because this court has already found Defendant to be a credit repair organization. Accordingly, § 1679b(a)(3) and (4) apply to Defendant.

Section 1679b(a)(3) provides that it is unlawful for any person to "make any untrue or misleading representation of the services of the credit repair organization." On its face, this portion of the CROA does not appear to require anything more than

a showing that some of Defendant's statements were misleading. In *FTC v. Gill*, the Ninth Circuit addressed a claim for summary judgment under § 1679b(3) of the CROA. 265 F.3d at 955. The defendant in *Gill* conceded that he made statements over the radio that could have been interpreted to be false. *Id.* The court found that the "overall 'net impression'" communicated by the statements was misleading and that "even if the information was accurate, complete and not obsolete," the misleading nature of the statements constituted a violation of § 1679b(a)(3) of the CROA. *Id.* at 956. The court reasoned that § 1679b(a)(3) "liability attaches even if the representation made by the [defendant] is not made 'for the purpose of induc[ing]' consumers to purchase a ... service." *Id.* at 955. To show a violation of § 1679b(3), all that is necessary is "an untrue or misleading statement regarding the services of" a credit repair organization. *Id.* Accordingly, the court granted summary judgment for the plaintiff. *Id.*

The *Gill* court noted that a violation of § 1679b(3) is also a violation of 15 U.S.C. § 45(a).[19] § 1679h(b)(1). Section 45(a) prohibits unfair competition and "unfair or deceptive acts or practices in or affecting commerce."[20] Under § 45(a) the Eleventh Circuit has held that finding liability does not require a showing of individual reliance. *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir.2000). Rather, "[a] presumption of actual reliance arises once [plaintiff] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *Id.* The *Gill* court adopted a similar standard for violations of § 1679b(3) under the CROA.

If the plaintiff must only show that the defendant, *in general*, made misleading or untrue statements under § 1679b(a)(3), the court must determine by whose standard the statements are deemed misleading. In *White v. Financial Credit Corp.*, the plaintiff brought parallel claims under the Fair Debt Collection Practices Act (FDCP) and the CROA, alleging that the defendant, a credit agency, used misleading statements while trying to collect debt from the plaintiff. No. 99 C4023, 2001 WL 1665386, at *6 (N.D.Ill.Dec. 27, 2001).[21] Because the plaintiff's FDCP and CROA claims where identical, the court concluded that the same standard which applied to the deceptive and misleading statements under the FDCP applied to statements made under the CROA. *Id.* Accordingly, the court determined that, under § 1679b(a)(3) and (4), to succeed, the plaintiff must show the statements to be misleading to the "unsophisticated debtor." *Id.*[22]

---

**19.** 15 U.S.C. § 45(a) does not provide a private right of action, but is only enforceable by the FTC. *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1008 n. 13 (5th Cir.1981).

**20.** The legislative history of the CROA indicates that credit repair organizations are to be prohibited from "making any untrue or misleading representations," and "engaging in deceptive acts or practices." S.Rep. No. 103–209, at 30 (1993). The language "deceptive acts or practices," is identical to the prohibition contained in 15 U.S.C. § 45(a). While certainly not conclusive, this is at the least indicative that the standard applied under § 1679b(a)(3) should be similar to that applied under § 45(a).

**21.** The FDCP prohibits a creditor agency from using "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt." 15 U.S.C. § 1692e (1996).

**22.** The *White* court concluded that both § 1679b(a)(3) and (4) were judged by the "unsophisticated debtor" standard. As will become evident hereinafter, this court accepts the *White* court's reasoning as to § 1679b(a)(3) but rejects the same conclusion for § 1679b(a)(4).

▉▉ While the Eleventh Circuit has not addressed this issue under the CROA, it has articulated a standard under the FDCP. In *Jeter v. Credit Bureau, Inc.*, the district court had ruled that under the FDCP a misleading statement is one that would mislead a reasonable consumer. 760 F.2d 1168, 1172 (11th Cir.1985). The Eleventh Circuit rejected this contention and noted that the FTC Act (which the court found analogous to the FDCP) was passed to protect unsophisticated consumers, not only those who are reasonable. *Id.* Consumer protection statutes must protect "the public-that vast multitude which includes the ignorant, the unthinking and the credulous." *See id.* at 1172–1173 (citations omitted). The *Jeter* court concluded that prior FTC enforcement actions, coupled with the history of the FDCP and the relevant jurisprudence, all supported the finding that a statement is misleading if it deceives the "least sophisticated consumer." *See id.* at 1175.

▉▉ In the instant case, the court finds the reasoning of both *White* and *Jeter* persuasive. Though the Eleventh Circuit has not specifically decided which standard applies under § 1679b(a)(3), the same reasoning that was apposite in *Jeter* applies to the case now before the court. The CROA was not meant to protect only those consumers who are reasonable. Accordingly, under § 1679b(a)(3) a statement is misleading if it would deceive the least sophisticated consumer.

Plaintiff also brings a claim under § 1679b(a)(4), which is more specific than § 1679b(a)(3) and prohibits any person from engaging in any action "that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization." It is not entirely clear what type of fraud or deception is required by § 1679b(a)(4). Typically, fraud requires a

heightened standard of pleading and a showing of reliance and damages. *See* FED. R. CIV. P. 9(b). The CROA, however, is silent on these issues and this court is unaware of any case law directly addressing them.

▉▉ It is a well established precept of statutory construction that "a statute ought, upon the whole to be construed that, if it can be prevented, no clause, sentence, or word shall be superfluous or void, or insignificant." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). Furthermore, as noted earlier, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown*, 513 U.S. at 120, 115 S.Ct. 552. Looking at the plain language of the statute, it is clear that § 1679b(a)(4) is meant to target different behavior than § 1679b(a)(3). Otherwise, § 1679b(a)(4) would have no effect at all, rendering it "superfluous or void." *TRW*, 534 U.S. at 31, 122 S.Ct. 441. Likewise, Congress's inclusion of the term fraud in § 1679b(a)(4) indicates that the standard for the two sections is indeed different. If a successful claim under § 1679b(a)(3) requires only a showing of a misleading statement and does not require a showing of damages or reliance, then § 1679b(a)(4) requires something more. Thus, the court holds that § 1679b(a)(4), consistent with the requirements of fraud, requires a showing of reliance and actual damages.

▉▉ In sum, the court finds that § 1679b(a)(3) requires that the Plaintiff show Defendant made material statements, which would be untrue or misleading in the eyes of the least sophisticated consumer, that were widely disseminated and that consumers have purchased Defen-

dant's service. *See McGregor*, 206 F.3d at 1388. In contrast, in order to avoid making § 1679b(a)(4) meaningless, and taking heed that Congress intentionally used the word fraud in subsection (4) and not in subsection (3), the court finds that, to succeed on an claim under § 1679b(a)(4), the Plaintiff must show individual reliance and damages, as would be required of a traditional fraud claim. Finally, because subsection (4) provides that "an attempt to commit, a fraud" is a violation, the court finds that the Plaintiff may succeed on this claim, without showing individual reliance, only if he can show specific intent to defraud. Otherwise, reliance is required under § 1679b(a)(4).

 Plaintiff now has the burden of showing that Defendant has made misleading representations or attempted to commit fraud as outlined above in § 1679b(a)(3) and (4). In support of its contention, Plaintiff points to several of the statements made on Defendant's website. For example, Defendant's website tells customers to "go to the Members–Only Dispute Tips section and see what our experts recommend." The page further suggests that Defendant's "credit experts" will "suggest ways [to] dispute inaccuracies" on a credit report. (Pl.Ex. N). Defendant admits that the referenced experts are not trained to know what negatively affects a credit report. (Pl.Ex. C at 208). Defendant also concedes that handling disputes is not part of its job and that its representatives are not trained in this area either. (Pl.Ex. C at 208). Defendant also admits that among its staff there is no employee who carries the title of credit expert. (Pl.Ex. C at 216). Furthermore, there is no one-to-one interaction between its employees and its customers. (Pl.Ex. B at 194). As discussed earlier, Defendant makes some statements which might lead the average consumer to believe Defendant can actually improve a persons's credit. In response to Plaintiff's assertions

that statements on its website are misleading or fraudulent, Defendant contends that references to "experts" on its website are merely titles of particular sections consumers may visit. In particular, the "Ask the Expert" section allows consumers to type in questions which are then researched by Defendant's staff and answers are posted on the website to the five most frequently asked questions. (App. I, Tab 1, ¶ 33).

As to § 1679b(a)(3), Plaintiff has not presented evidence sufficient to prevail on summary judgment. The Defendant's statements through its website might be considered misleading to the least sophisticated consumer by a reasonable jury, but a jury might also conclude the opposite. As the *Jeter* court recognized "whether the least sophisticated consumer would construe," Defendant's website statements as misleading is an issue of fact for a jury to decide. *See Jeter*, 760 F.2d at 1177–1178. Genuine issues of material fact exist as to whether Defendant's websites contain untrue and misleading information in violation of § 1679b(a)(3), and Plaintiff's motion for summary judgment is due to be denied on this issue.

 Regarding § 1679b(a)(4), because Plaintiff must present evidence sufficient for a jury to conclude Plaintiff himself individually relied upon Defendant's statements, Plaintiff's Motion for Summary Judgment is due to be denied and Defendant's is due to be granted. While it is possible for Plaintiff to show that Defendant's websites contain misleading statements in general, Plaintiff has failed to come forward with evidence sufficient for a jury to conclude he actually relied upon any one statement. Plaintiff admits that he cannot recall the precise pages he looked at. (Def.App. III, Tab 27 at 101, 116). Plaintiff also admits that, after his initial visit, he never went back to the Defendant's website. (Def.App. III, Tab

27 at 126). The only precise statement Plaintiff points to as misleading him is on the email he received from Defendant with his purchase of the CreditCheck monitoring service. (Def.App. III, Tab 27 at 132). Plaintiff contends the statement that he would receive monthly monitoring of his statement was not true. (Def.App. III, Tab 27 at 132). Plaintiff is incorrect. Defendant explains that monitoring alerts are provided, but only if the consumer uses his password and checks for the alerts on Defendant's website. (Def.App. I., Tab 1, ¶ 15). In short, Plaintiff's mere misunderstanding of Defendant's website does not provide a sufficient basis from which a jury could conclude Defendant engaged in fraud. Moreover, Plaintiff has offered no evidence that Defendant specifically intended to defraud consumers.[23]

### *Conclusion*

In conclusion, the court holds that Defendant is a credit repair organization as defined by the CROA. Because Defendant admittedly does not comply with § 1679b(b), § 1679c, § 1679d, and § 1679e(b) and (c), Plaintiff's motion for summary judgment as to those portions of the CROA is hereby GRANTED, and Defendant's cross motion for summary judgment is DENIED. Because material issues of fact exist with regard to Plaintiff's claim that Defendant violates § 1679b(a)(3), Plaintiff's motion for summary judgment is DENIED on this issue, and Defendant's cross motion is likewise DENIED. Finally, the Plaintiff has failed to come forward with evidence sufficient to allow a reasonable jury to conclude that he relied upon specific false statements made by Defendant. There is no genuine issue of material fact with regard to Plaintiff's

claim of fraud under § 1679b(a)(4). Accordingly, Defendant's cross motion for summary judgment as regards § 1679b(a)(4) is GRANTED, and Plaintiff's motion for summary judgment on this issue is DENIED. Because Plaintiff's claims for unjust enrichment and violation of § 1679b(a)(3) remain unresolved, the court declines to make any damage determination at this stage of the litigation. Only upon resolution of the above mentioned claims will the court be able to properly determine damages under § 1679g of the CROA.

As noted earlier by the court, there is no controlling Eleventh Circuit precedent on the claims addressed in this memorandum and order. Whether the Defendant in this case is a credit repair organization is a "controlling question of law," and an "immediate appeal from [this court's] order may materially advance the immediate termination of the litigation." 28 U.S.C. § 1292(b) If, on appeal, this court's determination regarding Defendant's status as a credit repair organization is reversed, Defendant's cross motion for summary judgment would be granted, and the litigation would likely end. Conversely, if the Court of Appeals rules that the Defendant is a credit repair organization, the resources invested in the litigation thereafter, judicial and otherwise, will be made knowing that a major, and controlling, question of law has been resolved. Therefore, the court's foregoing ORDER is certified for immediate interlocutory appeal to the Eleventh Circuit Court of Appeals. *See e.g., Leach v. Braswell,* 804 F.Supp. 1551, 1556 (S.D.Ga.1992). Any of the parties involved may pursue appeal.

---

**23.** The fact that Defendant's website actually warns consumers to avoid "credit repair" clinics and other similar scams does not support a finding that Defendant has in any way intentionally attempted to defraud its customers. (Pl.Ex. H, I).

The hearing scheduled for February 28, 2005, is CANCELLED.